UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIAM R. CUNNINGHAM and CUNNINGHAM ELECTRONICS CORPORATION,<br><br>       Plaintiffs/Counterdefendants,<br><br>  v.<br><br>POSNET SERVICES, LLC,<br><br>       Defendant/Counterplaintiff,<br><br>  and<br><br>MARK SMITH,<br><br>       Defendant. | Case No. 05-cv-4191-JPG |
| POSNET SERVICES, LLC,<br><br>       Plaintiff,<br><br>  v.<br><br>WILLIAM R. CUNNINGHAM and CUNNINGHAM ELECTRONICS CORPORATION,<br><br>       Defendants. | Consolidated with<br>Case No. 06-cv-4033-JPG |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on the second motion for summary judgment filed by plaintiffs/counterdefendants William R. Cunningham ("Cunningham") and Cunningham Electronics Corporation ("CEC") (Doc. 68) seeking to dispose of defendant/counterplaintiff POSnet Services, LLC's ("POSnet") counterclaims. POSnet has responded to the motion (Doc. 80), and Cunningham and CEC have replied to that response (Doc. 84).

I.  **Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

**II.     Facts**

Viewing all the evidence and drawing all reasonable inferences in favor of POSnet, the Court finds the following facts for the purposes of this motion.

  A. <u>The Joint Venture Agreement</u>

On December 23, 2002, CEC, Cunningham and POSnet entered into a joint venture memorialized by the Joint Venture Agreement ("JVA"). The joint venture was established with the purpose of facilitating retail merchants' clearing of paper coupons and electronic discount offers redeemed at their establishments by their customers. CEC was becoming involved in the business of clearing paper coupons and POSnet was becoming involved in the business of clearing electronic discount offers. The joint venture aimed to jointly develop and operate a hardware and software system ("the System") that would allow retail merchants to process both paper coupons and electronic discount offers at terminals located in their stores and receive payment for those coupons the following day.

The JVA provided that Cunningham would personally loan POSnet up to $6 million to develop and operate the System and that POSnet would make interest payments every month and would make principal payments for any month POSnet has a net profit. *See* JVA ¶¶ 3 & 4.

The JVA also obligated CEC to perform several duties. First, CEC promised to provide prompt "settlement services," that is, to pay retail merchants one day after the merchants processed the paper coupon and electronic discounts at the in-store terminals. The payment amount was to be based on a daily summary of the terminal activity provided by POSnet. *See* JVA ¶¶ 5(a) & 7(1)(b). CEC also agreed to provide POSnet a copy of an operating agreement between CEC and a financial institution "sufficient to enable CEC to perform the Settlement Services hereunder." *See* JVA ¶ 5(c). The JVA contained no explicit promise from CEC that

the settlement services it would provide would be acceptable in the industry.

CEC also assumed responsibility for certain aspects of the development and operation of the System, namely, to maintain a coupon offer registry cataloging all discount offers by manufacturers and to furnish, install and maintain a terminal at each retail store and customer identification keypads as required.  *See* JVA ¶ 7(1)(a), (c) & (d).  Other than the obligation to settle with retail stores within a day, the JVA contained no time limit for CEC to perform its promises.

For its part, POSnet promised to send a weekly invoice to manufacturers summarizing the clearing activity for their products and the fees assessed during the previous week.  *See* JVA ¶ 5(b).  It also promised to furnish, install and maintain the hardware and software for the central control function of the System as well as the software used by retail merchants to redeem paper coupons and electronic discount offers and the software used in the in-store terminals and customer identification keypads.  Essentially, POSnet was responsible for making sure all of the computer programs worked together.  *See* JVA ¶ 7(2)(a) & (b).  Finally, POSnet promised to market the System to potential users and to provide staff to operate the System.  *See* JVA ¶ 7(2)(c) & (d).

The JVA also includes an agreement not to disclose confidential or proprietary information of any other party to the JV, *see* JVA ¶¶ 11 & 12, and an integration clause providing that the JVA is the entire agreement among the parties and supersedes all prior agreements and understandings,  *see* JVA ¶ 17.

In November 2004, the parties amended the JVA ("AJVA") to allow CEC to pay retail merchants weekly when POSnet issued invoices to the manufacturers instead of daily, as set forth in the JVA.  *See* AJVA ¶ 2.  The AJVA further committed CEC to loaning POSnet the

Case 4:05-cv-04191-JPG-DGW   Document 110   Filed 06/28/07   Page 5 of 17   Page ID #962


balance of the $6 million.  *See* AJVA ¶ 1.

    B.    <u>The Performance</u>

        1.    <u>The Loan</u>

Cunningham performed his obligation under the JVA; he loaned POSnet $6 million. Tim Halfman ("Halfman"), one of POSnet's managers, contests that Cunningham made a loan and instead insists that the transfer of $6 million was an investment. However, in light of the JVA's express contemplation of a $6 million loan, the only reasonable interpretation of the transaction is that it was a loan pursuant to the JVA.

        2.    <u>Settlement Services</u>

As for CEC's performance, on March 16, 2005, CEC gave POSnet a copy of an unexecuted copy of a guarantee agreement and a secured promissory note with Bank of America, a "Manufacturer Master Agreement" and a "Retailer Master Agreement" relating to paper coupon offers CEC planned to have product manufacturers and retailers, respectively, sign. The guarantee agreement and the note contemplated that Bank of America would provide the financing for the settlement process. Halfman, who had over twenty years of experience in the settlement industry, reviewed the documents for POSnet and determined that, in his opinion, the financing approach and the  proposed master agreements were not viable because they were not acceptable to the general industry.

Specifically, one provision in the Manufacturer Master Agreement required the product manufacturers to furnish a letter of credit sufficient to cover amounts in play during a weekly settlement cycle for paper coupons, that is, the discount amounts CEC may pay to retail establishments each Monday before CEC is reimbursed by the manufacturer for those amounts plus fees by the following Friday. In Halfman's opinion, this and several other terms contained

in the Manufacturer's Master Agreement were not acceptable in the general industry.

The Retailer Master Agreement provided that the retailer would give CEC a secured interest in its coupons and in the right to payment of those coupons. Again, in Halfman's opinion, the requirement of a lien was unacceptable in the industry.

In response, POSnet told CEC the master agreements were unacceptable but did not propose any specific changes to the master agreements in writing because Cunningham had repeatedly informed POSnet that the form of the master agreements was not negotiable. POSnet did not present the master agreements to any potential users of the System although it discussed the financing approach proposed by CEC with two manufacturers and a consultant, all of which confirmed POSnet's judgment that the approach was not viable in the industry.

### 3. Coupon Terminals

In August 2003, CEC provided POSnet with a prototype coupon unit. Initially, the terminal was running properly, and POSnet managers were happy with its performance. However, it had some minor problems scanning coupons and had to be sent back to CEC for reconditioning. Both CEC and POSnet representatives believed the prototype unit's performance was not consistent, and CEC attempted to remedy this problem with revisions to the terminal, which worked better after the revisions.

CEC eventually provided POSnet with a total of five coupon terminals, and Brian Rock, a POSnet manager, conducted at least five successful but carefully controlled demonstrations of various versions of the coupon terminals at industry conferences from late 2003 to mid-2005. At one demonstration, the coupon terminal began "acting up" and had to be sent back to CEC. Cunningham testified that the coupon terminals worked, but POSnet management believed they were not in a condition for it to function well for an untrained operator. Believing the terminals

were not workable for actual use in stores, POSnet did not market them to potential users.

        4.        <u>Confidentiality Agreement</u>

During the course of the development of the System, CEC was privy to POSnet confidential information and trade secrets. At some point during the joint venture arrangement, CEC began searching for another entity to provide the services POSnet had agreed to provide. POSnet managers suspected that CEC had provided POSnet materials to those entities, but Cunningham testified he did not share any confidential POSnet information with any such alternative venturer.

CEC continued to represent to POSnet through 2005 that it would furnish settlement service and coupon terminals. However, believing CEC had breached the JVA, POSnet stopped marketing the System around March 2005. It does not currently participate in any discount settlement program using coupon terminals as contemplated in the JVA.

        C.        <u>The Litigation</u>

On September 23, 2005, Cunningham and CEC filed this lawsuit against POSnet in the Circuit Court of Union County, Illinois. POSnet removed the case to federal court on October 11, 2005, on the basis of original diversity jurisdiction. *See* 28 U.S.C. § 1332(a). In November 2006 they amended the Complaint to add Mark Smith ("Smith"), one of POSnet's managers, as a defendant. The First Amended Complaint alleges causes of action for a declaration that Cunningham and CEC are entitled to certain rights under the AJVA (Count I), for breach of the JVA and AJVA (Count II), for fraudulent misrepresentation (Count III) and for fraudulent concealment (Count IV).

On December 20, 2006, POSnet answered and brought counterclaims against Cunningham and CEC for breach of the JVA and the AJVA (Counterclaim Count I), for

violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (Counterclaim Count II), for fraudulent misrepresentation (Counterclaim Count III) and, in the alternative, for a declaration that the JVA and AJVA are terminated and unenforceable (Counterclaim Count IV). Cunningham and CEC filed the pending motion for summary judgment seeking judgment on all four counterclaims brought by POSnet.

**III.   Analysis**

    A.    <u>Counterclaim Count I:  Breach of Contract for Failing to Provide Settlement Services and Coupon Terminals</u>

In Counterclaim Count I, POSnet alleges that Cunningham and CEC breached the JVA and AJVA by, among other things,[1] failing to provide the settlement services CEC agreed to provide and failing to provide fully functional coupon terminals. Cunningham and CEC argue that they are entitled to summary judgment on both claims.

In order to establish a cause of action for breach of a contract under Illinois law, a plaintiff must prove (1) that a valid and enforceable contract existed, (2) that the plaintiff substantially performed his obligations under the contract, (3) that the other party breached the contract, and (4) that the plaintiff was damaged as a result of the breach. *See Zirp-Burnham, LLC v. E. Terrell Assocs., Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005); *Action Constr. & Restoration, Inc. v. West Bend Mut. Ins. Co.*, 748 N.E.2d 824, 826 (Ill. App. Ct. 2001).

    1.    <u>Claims Against Cunningham</u>

Cunningham asks for summary judgment on the two foregoing claims because he, as an individual, did not promise to provide settlement services or provide coupon terminals; those

---

[1] Because CEC and Cunningham do not address the allegations of breach of fiduciary duties, those claims survive this motion for summary judgment.

obligations rested with CEC alone under ¶¶ 5 and 7 of the JVA. In the absence of a contract to provide settlement services or to provide coupon terminals, Cunningham cannot be liable for a breach and is entitled to summary judgment. However, Cunningham's motion did not address POSnet's claim that Cunningham breached fiduciary duties, and those claims remain for adjudication at trial.

2. CEC's Provision of Settlement Services

POSnet alleges that CEC breached the promise to provide settlement services because the settlement services it arranged were unacceptable in the industry due to the requirements that manufacturers obtain letters of credit and retailers give liens on their coupons.

CEC asks for summary judgment on this claim because it believes there is no genuine issue of material fact regarding whether it has provided satisfactory settlement services. It points to the documents it provided POSnet on March 16, 2006 – the unexecuted guarantee from Bank of America and the master agreements for participating manufacturers and retailers to execute – to argue that it provided those services. CEC argues that there is no evidence to support POSnet's managers' belief that the Manufacturer Master Agreement is unacceptable in the industry because it requires letters of credit or that the Master Retailer Agreement is unacceptable in the industry because it requires retailers to give liens on their coupons. It further argues that POSnet was undisputedly aware at the time the JVA was executed that the settlement arrangements would involve a financial institution, *see* JVA ¶ 5(c), and that arrangements with a financial institution would necessarily involve liens.

Even if the Manufacturer Master Agreement and Retailer Master Agreement did not comport with standard industry practice, CEC argues that nothing in the JVA requires its settlement services to comply with that standard practice or to be viable in the industry. To the

9

extent that the absence of such language creates an ambiguity in the JVA, CEC urges the Court to examine the parties intent by reference to prior versions of the JVA, which it has neglected to attach to its motion. CEC claims that prior drafts of the JVA included the requirement that the settlement services be consistent with industry standards. It argues that the omission of such a provision from the final JVA indicates that compliance with industry standards was not intended to be included as a term of the JVA.

To decide whether summary judgment is appropriate on this issue, the Court must first examine the true meaning of the JVA regarding the provision of settlement services. Under Illinois law, which all parties agree applies in this case, when construing a contract the Court must give effect to the intent of the parties. *Schek v. Chicago Transit Auth.*, 247 N.E.2d 886, 888 (Ill. 1969). The Court must first attempt to determine this intent solely from the contract language. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (citing *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (Ill. 1962)); *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984). It is the Court's duty to construe and enforce the contract as it was written. *Shaffer v. Liberty Life Assur. Co. of Boston*, 746 N.E.2d 285, 288 (Ill. App. Ct. 2001). If the language is unambiguous, the Court must interpret the contract as a matter of law without reference to extrinsic, or parol, evidence. *Air Safety*, 706 N.E.2d at 884. On the other hand, if the language is susceptible to more than one meaning, then the contract is ambiguous and parol evidence may be used to determine the parties' intent. *Air Safety*, 706 N.E.2d at 884.

A contract is ambiguous if it is reasonably and fairly susceptible to more than one meaning. *Lenzi v. Morkin*, 452 N.E.2d 667, 669 (Ill. App. Ct. 1983), *aff'd*, 469 N.E.2d 178 (Ill. 1984). In determining whether there is an ambiguity, the Court must examine the contract as a whole, not its separate parts taken out of context, *Wilkin v. Citizens Nat'l Bank of Paris*, 18

N.E.2d 251 (Ill. App. Ct. 1939); *Halper v. Halper*, 373 N.E.2d 598, 600 (Ill. App. Ct. 1978), and must be guided by the purpose of the contract. *Unites States Trust Co. of N.Y. v. Jones*, 111 N.E.2d 144, 147 (Ill. 1953). Furthermore, an ambiguity does not exist simply because the parties disagree about a contract's meaning. *Central Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004); *Paris-Custardo v. Great Am. Ins. Co. of N.Y.*, 844 N.E.2d 1011, 1014 (Ill. App. Ct. 2006).

When the JVA is read as a whole, the intent of the parties as to the obligation to provide viable settlement services is clear. The JVA evinces the parties' overall purpose: to embark on a joint venture coupon redemption and clearing business that would succeed in the industry. The only reasonable meaning of the promise to provide settlement services is that it is a promise to provide settlement services *viable in the industry*. Otherwise, the promise would permit a party to sabotage the joint venture. Such an understanding is unreasonable in light of the entire JVA.

CEC attempts to create an ambiguity in the JVA by reference to prior drafts that contained a requirement that settlement service meet industry standards. Where the language of a contract is unambiguous on its face but the context of the contract reveals that the language may not mean what it seems to mean on its face, Illinois courts have recognized an "extrinsic ambiguity" and have provisionally admitted parol evidence to prove that ambiguity. *Air Safety*, 706 N.E.2d at 885 (citing *Ahsan v. Eagle, Inc.*, 678 N.E.2d 1238, 1241 (Ill. App. Ct. 1997)). If a party demonstrates an extrinsic ambiguity, the trier of fact may then consider parol evidence to determine the meaning of the ambiguity. *Air Safety*, 706 N.E.2d at 885.

However, the Illinois Supreme Court has rejected this approach to interpretation of contracts that contain an integration clause, as the JVA does. *Air Safety*, 706 N.E.2d at 885. An integration clause holds each party "'conclusively bound by the terms of the agreement as

11

expressed in the writing' . . . and makes clear that the negotiations leading to the written contract *are not* the agreement." *Air Safety*, 706 N.E.2d at 885 (quoting *Armstrong Paint & Varnish Works v. Continental Can Co.*, 133 N.E. 711, 713 (1921)) (emphasis in original). "[C]onsidering extrinsic evidence of prior negotiations to create an 'extrinsic ambiguity' where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null." *Air Safety*, 706 N.E.2d at 885. Thus, the Court is confined to the language of the JVA to determine its meaning, and, as explained above, that language is clear in light of the purpose of the JVA.[2]

There is conflicting evidence whether CEC provided settlement services viable in the industry. While CEC believes its settlement arrangements were anticipated by POSnet and were acceptable to it, Halfman, a manager of POSnet who is very experienced in the industry, testified that based on his knowledge and experience they were not. This issue of fact must be decided by a jury.

### 2. CEC's Provision of Coupon Terminals

POSnet alleges that CEC breached the promise to provide functioning coupon terminals because it had not yet developed a coupon terminal that was usable by untrained operators like those who would be actually using them in retail stores and that was actually ready for production. CEC asks for summary judgment on this claim because it provided POSnet five coupon terminal units that were successfully demonstrated at at least five trade shows.

All parties appear to agree that the JVA obligated CEC to provide functioning coupon

---

[2] Even had the Court been able to consider prior drafts of the JVA, it could not because CEC omitted them from its motion. Neither did it remedy the omission when POSnet pointed it out in its response brief. It has therefore waived any request for the Court to consider them to shed light on the meaning of the JVA.

terminals. They disagree whether the five CEC provided were sufficiently functional and whether CEC was prepared to manufacture them for distribution to and use in retail stores.

There is a genuine issue of fact regarding the adequacy of the terminals CEC provided. The evidence viewed in POSnet's favor shows that they were sensitive and only functioned in a carefully controlled environment by a trained operator. Based on this evidence, a reasonable jury could find that the terminals did not function as contemplated by the JVA and were therefore inadequate. Summary judgment is not appropriate on this claim.

      B.      <u>Counterclaim Count I:  Breach of Confidentiality Agreement
Counterclaim Count II; Illinois Trade Secrets Act</u>

POSnet alleges in Counterclaim Count I that Cunningham and CEC breached the provisions in the JVA requiring them to keep POSnet's confidential information and trade secrets confidential. In Counterclaim Count II, POSnet claims that the disclosure of this information also violated the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*. It suspects that Cunningham and CEC gave POSnet's confidential intellectual property to other companies it was trying to recruit to fulfill the duties POSnet had agreed to fulfill in the joint venture.

Cunningham and CEC ask for summary judgment on these claims because they believed POSnet has no evidence they misappropriated any secret information from POSnet or provided it to any third parties. Essentially conceding its allegations are based solely on suspicions, POSnet asks the Court to withhold ruling on this portion of the motion until it can obtain more discovery to support those suspicions. *See* Fed. R. Civ. P. 56(f). They believe they will be able to discover that another company has agreed to do for Cunningham the things POSnet agreed to do in the JVA for far less money, raising the inference that the new company would use POSnet's confidential information to complete the System more cheaply. Alternatively, POSnet argues

that a jury should decide whether Cunningham is credible when he says he did not misappropriate any confidential POSnet information.

As a preliminary matter, the Court addresses whether it will deny or withhold ruling on this part of the summary judgment motion under Rule 56(f). Rule 56(f) states

> **When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

"Summary judgment should not be entered 'until the party opposing the motion has had a fair opportunity to conduct such discovery as may be necessary to meet the factual basis for the motion.'" *Grayson v. O'Neill*, 308 F.3d 808, 815 (7th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). A court has the discretion to grant a Rule 57(f) motion, but "[w]here a party's own lack of diligence is to blame for that party's failure to secure discoverable information, it is not an abuse of discretion to deny a Rule 56(f) motion." *Grayson*, 308 F.3d at 816.

There is no question that there has been sufficient opportunity for POSnet to obtain the discovery it needs to oppose Cunningham's motion and to support its own claim. This case was filed in state court in September 2005, and has been in federal court since October 2005. A discovery scheduling order was entered in January 2006 setting a discovery deadline in October 2006, and that deadline has been extended four times. POSnet knew that breach of confidentiality provisions would be at issue at least as early as December 2006 when it filed its counterclaims. Ample time was available for POSnet to obtain the discovery it needed to support its claims. POSnet states now that it did not conduct the needed discover because

14

settlement negotiations were ongoing.  This is not a very good reason for denying or postponing ruling on the pending summary judgment motion to allow more discovery.  While POSnet might have believed settlement was likely, it assumed the risk of failing to conduct adequate discovery should that settlement not materialize.

Nevertheless, the Court is mindful that delaying a ruling on the pending summary judgment motion relating to this issue is unlikely to impede the progress of this case.  A new defendant was added in late 2006, the current discovery deadline is months away (October 5, 2007) and the trial is not scheduled until February 2008.  The Court therefore exercises its discretion under Rule 56(f) to allow POSnet more time for discovery before deciding whether its confidentiality and trade secrets claims can withstand summary judgment.  Accordingly, the Court will deny CEC's motion for summary judgment on this issue.  CEC may file a new motion on the same issues once sufficient discovery has been conducted and before the dispositive motion deadline.  POSnet would be well-served to expeditiously obtain the discovery it needs to maintain this claim.

C.   Counterclaim Count III:  Misrepresentation

POSnet claims that sometime after the parties executed the JVA, Cunningham and CEC misrepresented that they would perform the promises contained in the JVA when they actually had no intention of doing so.  POSnet claims that it continued to work on and invest in the joint venture reasonably relying on these representations to its detriment.  Cunningham and CEC ask for summary judgment on this claim, pointing to the testimony of POSnet's managers that, at the time the JVA was executed, Cunningham and CEC intended to fulfill their promises.

In order to prevail on a claim for fraudulent misrepresentation, a claimant must prove "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making

it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *Board of Educ. v. A, C & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989) (citing *Soules v. General Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980)).

The Court cannot grant the summary judgment motion as it relates to this issue because Cunningham and CEC have not carried their burden. A movant can demonstrate the absence of a genuine issue of material fact either (1) by presenting uncontroverted evidence that negates an element of the claimant's case or (2) by pointing to a lack of evidence on an essential element of a plaintiff's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Cunningham and CEC have failed to present any evidence negating any element of POSnet's fraudulent misrepresentation claim to the extent that it rests on their conduct after the JVA was signed. Neither have they pointed to an absence of evidence to support POSnet's claim during this time period. Instead, their motion focuses solely on the time of the execution of the JVA. Thus, Cunningham and CEC have not met their burden of showing that there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law on Counterclaim Count III.

      D.     <u>Counterclaim Count IV:  Declaratory Judgment</u>

As an alternative to Counterclaim Counts I, II and III, POSnet seeks a declaratory judgment in Counterclaim Count IV stating that the JVA and AJVA is terminated and no longer enforceable against it. Cunningham and CEC seek summary judgment on Counterclaim Count IV on the basis that POSnet can prove none of its other claims. However, in light of the fact that a majority of POSnet's other claims remain pending, the Court cannot dispose of Counterclaim Count IV at this time.

**IV. Conclusion**

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Cunningham and CEC's motion for summary judgment on POSnet's counterclaims (Doc. 68). The motion is **GRANTED** to the extent that it seeks summary judgment on Counterclaim Count I against Cunningham for breach of contract for failing to provide settlement services and coupon terminals. Counterclaim Count I against Cunningham for breach of fiduciary duties and for breach of the confidentiality provision remains pending. The motion is **DENIED** as to all other counterclaims. The Court **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED: June 28, 2007**

                                       s/ J. Phil Gilbert
                                       **J. PHIL GILBERT**
                                       **DISTRICT JUDGE**